THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* VALENTÍN LEBRÓN ORTIZ, Defendant and Appellant.

No. 7961. Argued April 15, 1940.—Decided April 26, 1940.

*Alfonso Lastra Chárriez* and *A. D. Marchand Paz* for appellant.
*R. A. Gómez, Prosecuting Attorney (fiscal),* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE TRAVIESO delivered the opinion of the court.

The defendant and appellant was convicted of voluntary manslaughter and sentenced to four years in the penitentiary at hard labor. In support of this appeal the appellant alleges that it was error for the court:

Not to allow the defendant at the commencement of the trial to present evidence to prove the propriety of the continuance of the trial.

To refuse to transmit certain instruction as requested by the defense.

The incident referred to in the first assignment of error, such as the same appears from the record, is as follows:

The arraignment of the defendant took place on September 26, 1936. The defendant appeared in person and represented by counsel. As shown by the minutes of the court,

"after the defendant was arraigned and a copy of the information was delivered to him, he pleaded not guilty and asked to be tried by jury." According to the stenographer's notes at the time, which notes were submitted by the prosecution as evidence in rebuttal, and while being arraigned, the defendant was examined, without any difficulty, as follows:

"What is your name?—Valentín Lebrón. Are you single?—I am. What is your name?—Valentín Lebrón. Your second name?—Ortiz. What is your other name?—Lebrón. Ortiz, are you not Ortiz?—Ortiz. Lebrón Ortiz?—Yes, sir. How old are you?—I am forty. Single or married?—Single. Where do you live?—In Yabucoa. What is your trade?—Plumber."

Upon the case being called for trial on October 24, 1938, the attorney for the defendant requested a continuance of the trial and alleged as follows:

"Your Honor, there are circumstances in the present case which were unknown to me and they are that ... now on meeting the defendant I notice that he is quite deaf, nor can he see very well, and it so happens that he can not understand me; I defy any human being to understand this defendant. He is so deaf that no noise can penetrate his ears.

The judge decided to impanel the jury first and to adjourn as long as necessary so as to enable the attorney to talk and come to an understanding with his client. The attorney then stated that that was the first time he had talked with the defendant. Later on he moved for a continuance on the ground that as the defendant was deaf his attorney could not talk with him without other people hearing their conversation.

The jury being impaneled the defendant was arraigned. The information consists of seventy-five words. The judge asked what kind of defense the accused was going to plead, whereupon the following incident took place, as revealed by the transcript of the evidence:

"Q.—By leave of the court (addressing the defendant). Have you heard the contents of that paper which has just been read?

"A. What?

"Q. Have you heard what the paper read out to you says?

"A. Whether I heard it?

"Q. Yes.

"A. I have not heard it.

"Judge. He says: 'I have read it.'

"Counsel for defendant.

"Q. Can you read that?

"A. He does not answer.

"Q. Can you read what is said there?

"A. I have not heard it read.

"Q. If you can read that?

"A. Read it?

"Q. Read it.

"A. I can not see.

"Q. But have you no spectacles?

"A. I have none.

"Q. Where are your spectacles, you wear spectacles for reading?

"A. I do not wear them.

"Q. But can you read?

"A. A little.

"Q. Then read that.

"A. The trouble is that I can not see that in print, I can not see that on top in large print, I can not see it.

"Judge.

"Q. He says that he can not see what is on top, try and see what is below.

"A. I can not see it, if I saw it I would read it.

"Counsel for defendant.

"Q. What?

"A. If I saw it I would read it.

"Q. You have got to read it, see if you can read it, by leave of the court."

It appears from the record that on December 18, 1936, counsel for defendant, who had to leave for Europe, moved for the continuance of the trial and alleged in his motion that the defendant had engaged him and explained to him

in detail the facts of his case and that "having studied his case, it is his opinion that he has a good, legitimate and reasonable defense."

After a long colloquy between counsel for defendant and the court, the latter denied the motion for a continuance and made an entry of the plea of not guilty of the defendant. To the question whether the defendant had witnesses, counsel answered: "We have witnesses but we do not know what they will say; just now we are not in a position to submit evidence; he has witnesses. I can say to you that he has, that they are there, that I do not know what they will say but even if I knew it would not be possible for me so long as this man and I are unable to understand each other."

It appears from the testimony of the physician who examined the defendant the morning of the trial that the defendant is totally deaf of his right ear and partially so of his left ear; that he can hear if they shout to him loud enough or if he watches the modulation of the voice of any person talking to him deliberately; that he is shortsighted and can see well at a distance of eight inches.

Was it error for the lower court to deny the motion for a continuance of the trial? To our judgment, the court decided rightly. From September 26, 1936, to October 24, 1938, two years elapsed, more than enough to enable counsel for defendant to see his client, to acquaint him with the nature of the charge against him, to talk with his witnesses, to find out what the latter would say on the stand, and to take whatever measures might be necessary for a proper defense of the accused.

In spite of the allegation of counsel for the defendant —different from that made to obtain the continuance of the trial by reason of the trip to Europe—that the defendant on account of deafness could not know the charge against him and could not communicate with his attorney, as a matter of fact the defendant had in the court at the commencement

of the trial all the witnesses whom he used afterwards in support of his theory of self-defense.

To our judgment, the lower court was justified in its conclusion that the alleged deafness, which prevented the defendant from hearing the information when arraigned, and the alleged shortsightedness, which prevented him to read the same when shown to him, were nothing else than subterfuges to postpone the proceedings and delay the course of justice.

When examined at the time of the arraignment, the defendant had no difficulty whatever to hear and correctly answer the eleven questions put to him. We must assume that he could likewise hear the seventy-five words making up the information.

The examination of the witness during the trial, above quoted, is the best proof of the variable degree of deafness according to the circumstances at the time of questioning him. When the questions tend to find out whether he hears he answers: ''What?'', as if he had not heard, or he refrains from answering; but as the examination proceeds and it is sought to find out about his visual powers, the defendant begins to hear better and has no difficulty whatever in answering the nine or ten questions put to him for the purpose of ascertaining whether he can see sufficiently to read the information. Then he hears sufficiently to deny that he can see and answers: ''I do not see, I have no spectacles, I do not wear (spectacles);'' and goes on answering that he can read a little, that he can not see the printed types on the paper shown him, that if he saw them he could read them.

Although counsel for defendant has not raised any question as regards the sufficiency of the evidence, we have perused the transcript of the evidence and our conclusion is that the verdict is amply sustained by the evidence.

■ The second error assigned by the appellant is the refusal of the court to transmit to the jury the following instruction:

"The evidence submitted by the defendant tends to establish that he killed the deceased in self-defense in his home, a fact that makes self-defense less rigid than otherwise."

The court explained that it based its refusal on the ground that said instruction was covered by the general instructions already given to the jury. We have read the above instructions and agree with the lower court that the instruction was covered by the general instructions. One of the instructions of the lower court was as follows:

"Besides, gentlemen of the jury, part of the theory of the defendant tends to show that the defendant acted in self-defense in his home. In connection with this point the court will instruct the jury as to when is homicide justifiable."

After instructing the jury regarding the cases where homicide is justifiable, according to sections 207, 208 and 209 of the Penal Code, the court said:

"When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends or endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein.

"A person who kills one who in a violent, riotous, or tumultuous manner, intends or endeavors to enter the habitation of such person for the purpose of assaulting any one therein, commits a justifiable homicide."

The evidence for the defense failed to sustain the theory that the accused had killed the deceased in defense of habitation. The fight between the defendant and his nephew took place in the home of María Lebrón Ortiz, in which defendant was living and at which deceased frequently called as the nephew of the Lebrón brother and sister.

The judgment appealed from must be affirmed.